UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 13-11301-RGS

COMMONWEALTH OF MASSACHUSETTS, and
STATE OF NEW HAMPSHIRE

v.

PENNY PRITZKER, et al.

MEMORANDUM AND ORDER ON
THE PARTIES' CROSS-MOTIONS
FOR SUMMARY JUDGMENT

April 8, 2014

STEARNS, D.J.

Plaintiff Commonwealth of Massachusetts and Intervenor-Plaintiff State

of New Hampshire brought this lawsuit alleging that the Secretary of

Commerce (Secretary)[1], through the National Marine Fisheries Service

(NMFS)[2], unlawfully promulgated Frameworks (FWs) 48 and 50 regulating

New England's Multispecies Fishery, in violation of the Magnuson-Stevens

---

[1] At the time this action was filed, Dr. Rebecca Blank was Acting
Secretary of Commerce. Secretary Pritzker is substituted for Dr. Blank as
provided by Fed. R. Civ. P. 25(d).

[2] In addition to the Department of Commerce and NMFS (and individual
representatives in their official capacities), plaintiffs have sued the National
Oceanic and Atmospheric Administration (NOAA) and its Acting Under
Secretary and Administrator Kathryn Sullivan. NOAA is an agency housed in
the Department of Commerce, and NMFS is a division of NOAA.

Fishery Conservation and Management Act (MSA), 16 U.S.C. §§ 1801-1884. Plaintiffs now move on summary judgment to vacate the Frameworks. Defendants counter with their own motion for summary judgment. A hearing on the cross-motions was held on April 4, 2014.

BACKGROUND

Out of concern for rapidly depleting national fisheries and the ecological and social consequences that would follow, Congress enacted the MSA in 1976 to establish a national program for the conservation and management of fishery resources.[3] *See* 16 U.S.C. § 1801(a). The Act delegates to the Secretary the authority to implement a comprehensive national fisheries management program in order "to prevent overfishing, to rebuild overfished stocks, to insure conservation, to facilitate long-tem protection of essential fish habitats, and to realize the full potential of the Nation's fishery resources." *Id*. § 1801(a)(6). The Act created eight Regional Fishery Management Councils (Councils) composed of state fishery managers, the regional NMFS fisheries administrator, and representatives of the fishing, environmental, and academic communities. *Id*. § 1852(a)-(c). Councils are responsible for preparing Fishery

---

[3] A "fishery" is "one or more stocks of fish which can be treated as a unit for purposes of conservation and management and which are identified on the basis of geographical, scientific, technical, recreational, and economic characteristics" or "any fishing for such stocks." *Id*. § 1802(13)(A)-(B).

Management Plans (FMPs) and amendments, as well as recommending implementing regulations for the Exclusive Economic Zones. The zones extend 3 to 200 nautical miles seaward from the coastal boundaries of the States within each region. *Id*. §§ 1811(a), 1852(h)(1), 1853(c).

A council is required to submit a completed draft FMP (or amendment) to NMFS for review.[4] *Id*. §§ 1853(c), 1854(a). NMFS must ensure that the plan complies with the ten National Standards for fishery conservation and management set out in the MSA. *See id*. § 1851(a). After publishing notice of the plan in the Federal Register and receiving public comment,[5] NMFS then approves, disapproves, or partially approves the plan through a final rulemaking. *Id*. § 1854(a)(3). NMFS may disapprove a proposed plan, in whole or in part, only to the extent that it is inconsistent with applicable law – the agency cannot substantively modify a plan or amendment of its own volition. *Id*. NMFS (as the Secretary's designee) may, however, promulgate regulations necessary to effectuate a FMP or plan amendment. *Id*. § 1855(d).

---

[4] The Secretary has delegated her authority under the MSA to promulgate regulations implementing FMPs and their Amendments to NMFS.

[5] The MSA mandates a 60-day comment period before NMFS may approve an FMP or amendment. *Id*. § 1854(a)(1)(B). An implementing regulation goes through the same process of review, although NMFS may limit the period for public comment to a minimum of 15 days. *Id*. § 1854(b)(1)(A).

The New England Fisheries Management Council (NEFMC) oversees nine separate fisheries in the Atlantic Ocean seaward of the coast of Maine, New Hampshire, Massachusetts, Rhode Island, and Connecticut. *Id*. § 1852(a)(1)(A). NEFMC promulgated the first Northeast Multispecies Fisheries Management Plan (Groundfish FMP) in 1985. The Northeast Multispecies Fishery (or Groundfish Fishery) is a "mixed stock" fishery of thirteen groundfish species divided into twenty stocks that are often caught together.[6] Since its inception, the Groundfish FMP has undergone significant management changes in an effort to combat persistent overfishing and dwindling fishery stocks.[7] In 1996, "with the population of cod and other groundfish on the verge of collapse," NMFS and NEFMC created an expedited regulatory process known as a "framework adjustment." *Gulf of Maine*

---

[6] A "stock" is a "species, subspecies, geographical grouping, or other category of fish capable of management as a unit." *Id*. § 1802(42). The twenty stocks composing the fishery are: Georges Bank (GB) cod, Gulf of Maine (GOM) cod, GB Haddock, GOM haddock, GB yellowtail flounder, Southern New England/Mid-Atlantic (SNE/MA) yellowtail flounder, Cape Cod/GOM yellowtail flounder, American plaice, witch flounder, GB winter flounder, GOM winter flounder, SNE/MA winter flounder, redfish, white hake, pollock, Northern windowpane flounder, Southern windowpane flounder, ocean pout, Atlantic halibut, and Atlantic wolffish.

[7] For a more thorough history of the regulation of New England's Groundfish Fishery, see *Lovgren v. Locke*, 701 F.3d 5, 14-16 (1st Cir. 2012) and *Oceana, Inc. v. Locke*, 831 F. Supp. 2d 95, 102-105 (D.D.C. 2011).

*Fisherman's Alliance v. Daley*, 292 F.3d 84, 86 (1st Cir. 2002). Framework adjustments allow NMFS and NEFMC to respond more quickly and efficiently to fluctuations in the groundfish population. *See id.*

Congress significantly amended the MSA through enactment of the Magnuson-Stevens Fishery Conservation and Management Reauthorization Act of 2006, "which introduced a suite of stringent protections for depleted fisheries." *Lovgren v. Locke*, 701 F.3d 6, 12 (1st Cir. 2012). The Reauthorization Act mandated, among other requirements, that FMPs include Annual Catch Limits (ACLs) set "at a level such that overfishing does not occur in the fishery," as well as the imposition of "measures to ensure accountability" for strict adherence to the limits. 16 U.S.C. § 1853(a)(15).[8] The ACLs developed by a Council "may not exceed the fishing level recommendations of its scientific and statistical committee or the peer review process." *Id*. § 1852(h)(6).

To bring the Groundfish FMP into compliance with the new MSA requirements, NEFMC proposed, and NMFS approved, Amendment 16 in

---

[8] "Overfishing" is the "rate or level of fishing mortality that jeopardizes the capacity of a fishery to produce the maximum sustainable yield on a continuing basis." 16 U.S.C. § 1802(34). Maximum sustainable yield is "the largest long-term average catch or yield that can be taken from a stock or stock complex under prevailing ecological, environmental considerations and fishery technological characteristics . . . ." 50 C.F.R. § 600.310(e)(1)(i)(A).

2009.[9] At the time the Amendment was promulgated, the latest assessment of the Groundfish Fishery (completed in 2008) concluded that eleven of the Fishery's stocks were overfished and subject to overfishing.[10] 75 Fed. Reg. 18,262 (Apr. 9, 2010) (Third Groundfish Assessment Review Meeting results or GARM III). As is relevant here, Amendment 16 established a mechanism for setting ACLs for each stock managed by the Groundfish FMP. *Id*.; *see also* 78 Fed. Reg. 19,368 (Mar. 29, 2013).

The ACL is derived from three calculations. First, the Council must determine the Overfishing Limit (OFL). The OFL is the catch level above which overfishing occurs – in other words, the catch level above the maximum sustainable yield (MSY). 50 C.F.R. § 600.310(e)(2)(i)(D); 75 Fed. Reg. 18,356, 18,357 (Apr. 9, 2010). The Acceptable Biological Catch (ABC) – the maximum amount of fish that may be caught without surpassing the OFL – is then

---

[9] Amendment 16 refers here to three related rulemakings: the amendment itself, and two implementing frameworks. *See* 75 Fed. Reg. 18,113 (Apr. 9, 2010); 75 Fed. Reg. 18,262 (Apr. 9, 2010); 75 Fed. Reg. 18,356 (Apr. 9, 2010).

[10] A stock is "overfished" when "its biomass has declined below a level that jeopardizes the capacity of the stock . . . to produce MSY on a continuing basis." 50 C.F.R. § 600.310(e)(2)(i)(E). Overfishing "occurs whenever a stock . . . is subjected to a level of fishing mortality or annual catch that jeopardizes the capacity of a stock . . . to produce MSY on a continuing basis." *Id*. § 600.310(e)(2)(i)(B).

calculated from the OFL, taking into account scientific uncertainty in the initial estimate. 50 C.F.R. § 600.310(f)(2)(ii). In order to set the ABC, the Council must develop an ABC "control rule" based on advice from its Scientific and Statistical Committee (SSC) that "articulate[s] how ABC will be set compared to the OFL based on the scientific knowledge about the stock . . . and the scientific uncertainty in the estimate of OFL and any other scientific uncertainty." *Id*. §§ 600.310(f)(1), (2)(iii), (4). The objective of the control rule is to provide a buffer between OFL and ABC such that there is less than a 50% chance that overfishing will occur. *Id*. § 600.310(f)(4). Finally, working from the ABC, the Council sets the ACL for each stock, leaving a second buffer between the ABC and ACL for management uncertainty. *Id*. § 600.310(f)(1).[11]

Despite the new conservation measures imposed by the MSA, many groundfish stocks in New England did not show any sustained improvement. An assessment of the fishery completed in 2012 found that many of the stocks remained overfished and, of these stocks, a majority were subject to overfishing. *See* AR Doc. 43 at 2,558 (NOAA Assessment). In September of that year, Acting Secretary Blank formally declared the Groundfish Fishery a "disaster." *See* AR Doc. 138 at 8,841 (letter to Governor Deval Patrick).

---

[11] Expressed mathematically, the derivation of the ACL can be described as: $OFL \geq ABC \geq ACL$.

NEFMC adopted and NMFS promulgated Framework 50 to set specifications (OFLs, ABCs, ACLs) for groundfish stocks for the fishing years (FY) 2013-2015.[12] FW 50 instituted "severe cutbacks in catch limits" to prevent overfishing and rebuild overfished stocks. 78 Fed. Reg. 26,118, 26,145 (May 3, 2013). The catch limits are the lowest ever set for many of the stocks – including GOM and GB cod – in some cases representing an almost eighty percent reduction from 2012 levels (including the GOM cod stock). *Compare* 78 Fed. Reg. 26,172, 26,181 (May 3, 2013) (listing ACLs for FY 2013-2015) *with* 75 Fed. Reg. at 18,360 (listing ACLs for FY 2010-2012).[13] FW 48 imposed a range of measures, some favorable and others unfavorable to the immediate interests of the Massachusetts fishing community. Among other provisions, FW 48 listed the status of GOM and GB cod as "overfished" and "subject to

---

[12] FW 47 implemented in May of 2012 set specifications for some groundfish stocks for FY 2012-2014. AR Doc. 495 at 27,286.

[13] Amendment 16 also expanded the "sector allocation program" introduced in Amendment 13, which allows fishermen to voluntarily band together in sectors. Each sector then receives an allocation of the total amount of fish that may be caught in a given fishing year as an "annual catch entitlement" (ACE). *See* 69 Fed. Reg. 22,906, 22,914 (Apr. 27, 2004); *Lovgren*, 701 F.3d at 15-20. Amendment 16 permitted the "carryover" of unused ACEs into the next fishing year of up to 10% of unfished ACE. 75 Fed. Reg. at 18,277. FW 50, by way of emergency rule issued by NMFS, reduced carryover for GOM cod to 1.85% ACE, but otherwise kept the carryover program in place for FY 2013. 78 Fed. Reg. at 26,189.

overfishing," revised the status of SNE/MA yellowtail flounder and white hake to "not overfished" and "not subject to overfishing," and allowed sectors to apply for exemptions from previously-imposed year-round closure areas. *See* 78 Fed. Reg. at 26,122-26,131.

Massachusetts alleges that the new catch limits will effectively close down the entire Groundfish Fishery, and through this lawsuit moves to vacate Framework 48 and Framework 50 for failure to comply with National Standards 2 and 8 of the MSA. New Hampshire intervened in the action pursuant to Fed. R. Civ. P. 24(a)(2), contending that the frameworks also violate National Standard 1. For the reasons to be explained, the court will allow the Secretary's motion for summary judgment.

## STANDARD OF REVIEW

Challenges to agency actions under the MSA are reviewed under the Administrative Procedures Act (APA). 16 U.S.C. § 1855(f)(1); *Conservation Law Found. v. Evans*, 360 F. 3d 21, 27 (1st Cir. 2004). The APA permits a court to invalidate an agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

The MSA's ten National Standards "are broadly worded statements of the MSA's objectives for all fishery conservation and management measures" and their purposes "can be in tension with one another." *Lovgren*, 701 F.3d at 32.

"Compliance with the national standards requires balancing by the agency and the exercise of discretion and judgment." *Id*. Accordingly, when a framework adjustment is challenged as inconsistent with one of the standards, a court's task is to determine whether the conclusion by NMFS that the standards have been satisfied is rational and supported by the record. *N. Carolina Fisheries Ass'n v. Gutierrez*, 518 F. Supp. 2d 62, 79-80 (D.D.C. 2007); *see also Lovgren*, 701 F.3d at 33 (same).

"Fisheries regulation requires highly technical and scientific determinations that are within the agency's expertise, but are beyond the ken of most judges." *N. Carolina Fisheries Ass'n*, 518 F. Supp. 2d at 80. Thus, technical issues implicating NMFS' expertise are afforded substantial deference. See *The Ocean Conservancy v. Gutierrez*, 394 F. Supp. 2d 147, 157 (D.D.C. 2005); *see also Oceana, Inc. v. Pritzker*, 2014 WL 616599, at *5 (D.D.C. Feb. 18, 2014) (same). Deference, however, is not exercised with a "rubber stamp"; rather, the court must undertake a "thorough, probing, in-depth review" of NMFS' challenged decision. *Flaherty v. Bryson*, 850 F. Supp. 2d 38, 47 (D.D.C. 2012).

## DISCUSSION

**National Standard 1**

National Standard 1 provides that "[c]onservation and management

measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry." 16 U.S.C. § 1851(a)(1). Optimum yield (or OY) is defined in the MSA as the yield from a fishery that "will provide the greatest overall benefit to the Nation, particularly with respect to food production and recreational opportunities, and taking into account the protection of marine ecosystems." *Id*. § 1802(33)(A). Optimum yield "is prescribed on the basis of the maximum sustainable yield from the fishery, as reduced by any relevant social, economic, or ecological factor; and in the case of an overfished fishery, provides for rebuilding to a level consistent with producing the maximum sustainable yield in such fishery." *Id*. § 1802(33)(B)-(C).

The thrust of New Hampshire's argument is that NMFS improperly discarded considerations of social and economic factors in promulgating Framework 50 in favor of a "mechanistic and formula driven approach" exalting conservation goals to the exclusion of all others. New Hampshire identifies two purported errors by NMFS that allegedly violate National Standard 1: (1) the failure to consider the optimum yield of overfished stocks; and (2) the failure to evaluate how measures undertaken to protect imperiled cod stocks would impede the achievement of optimum yield of healthier stocks. NH's Br. at 5-6. As NMFS points out, however, New Hampshire's objections

to its formula for calculating the Acceptable Biological Catch and the Annual Catch Limit are properly directed to Amendment 16 in which the formulas were established, and not Framework 50,[14] which merely applied Amendment 16 in formulating specifications for FY 2013-2015.

Amendment 16 established the "process for biennial specification of OFLs, ABCs, and ACLs" for stocks in the Groundfish Fishery to comply with the 2007 Reauthorization of the MSA. 75 Fed. Reg. at 18,356; *see generally* 75 Fed. Reg. 18,262; 16 U.S.C. § 1853(a)(15) (Fishery Management Plans must "establish a mechanism for specifying annual catch limits . . . at a level such that overfishing does not occur in the fishery . . . ."). This was accomplished through the ABC control rule, which directed that the Acceptable Biological Catch should ordinarily be determined as the catch associated with 75% of the fishing mortality rate that produces the Maximum Sustainable Yield of a given stock. If the resulting rate does not achieve the mandated rebuilding requirements for an overfished stock, the ABC should be adjusted to a mortality rate that meets the requirements. *See* 75 Fed. Reg. at 18,265.

In *Lovgren*, the First Circuit rejected the argument that a stock-by-stock

---

[14] The court is sensitive to the sheer weight of the acronyms that fisheries science employs and will from time to time revert to the full spelling to lighten the load for the reader.

approach to setting Annual Catch Limits for the Groundfish Fishery violated National Standard 1 because it "improperly sacrifice[d] optimum yield to prevent overfishing within the Fishery's weakest stocks." 701 F.3d at 33. The Court of Appeals found that stock-by-stock catch limits (in lieu of aggregate limits for the entire fishery) complied with the MSA even if limits on overfished stocks would depress those of healthy stocks that are unavoidably caught with the endangered species. *See id*. at 33-34.[15]

Framework 50 did not alter the formula for specifying the Acceptable Biological Catch or Annual Catch Limits for stocks in the Groundfish Fishery, but simply applied the mechanism established in Amendment 16 to calculate those numbers. *See* 78 Fed. Reg. at 26,176 (describing use of ABC control rule adopted by Amendment 16); AR Doc. 42 at 2,550 ("ABCs are based on the current default ABC control rule that was proposed by the SSC and adopted in Amendment 16."). Accordingly, New Hampshire's challenge to the frameworks under National Standard 1 is foreclosed by the Court of Appeals' decision in

---

[15] The guidelines state that the "*most important limitation* on the specification of OY is that the choice of OY and the conservation and management measures proposed to achieve it *must prevent overfishing*." 50 C.F.R. § 600.310(b)(2)(ii) (emphasis added).

*Lovgren*.[16]

Moreover, NMFS did consider the economic impact that severe limits on unhealthy stocks could have on catches of healthier stocks and took mitigation measures that it believed were consistent with the overarching goal of fisheries conservation. *See, e.g*., 78 Fed. Reg. 18,188, 18,194 (Mar. 25, 2013) (reducing minimum fish size for groundfish stocks to reduce regulatory discards and increase revenue from catch); *id*. at 18,195 (eliminating dockside monitoring); 78 Fed. Reg. at 26,175-26,176 (permitting landings of SNE/MA flounder); *id*. at 26,188 (permitting 10% carryover from FY 2012 for one year); 78 Fed. Reg. 12,708 (Feb. 25, 2013) (increasing monkfish trip limits); AR Doc. 495 at 27,472-27,487 (considering economic impact of lower catch limits). On the whole, the balance struck in FW 50 was well "within the bounds of reasoned decisionmaking required by the APA." *Lovgren*, 701 F.3d at 33 (internal quotations and citation omitted).

**National Standard 2**

National Standard 2 provides that "[c]onservation and management measures shall be based upon the best scientific information available." 16

---

[16] NMFS argues that because New Hampshire is actually challenging Amendment 16, its claim is time-barred under the MSA. *See* 16 U.S.C. § 1855(f). Whether the claim is dismissed on the merits or on jurisdictional grounds, the result is the same.

U.S.C. § 1851(a)(2). The rule requires that NMFS "must utilize the best scientific data *available*, not the best scientific data *possible*." *Blue Water Fishermen's Assn v. Nat'l Marine Fisheries Serv.*, 226 F. Supp. 2d 330, 338 (D. Mass. 2002) (internal quotations and citation omitted) (emphasis in original); *see also* 50 C.F.R. § 600.315(e)(1) ("FMPs must take into account the best scientific information *available at the time of preparation*." (emphasis added)). National Standard 2 "is a practical standard requiring only that fishery regulations be diligently researched and based on sound science." *Flaherty*, 850 F. Supp. 2d 38, 61 (D.D.C. 2012) (internal quotations and citation omitted). "The fact that scientific information concerning a fishery is incomplete does not prevent the preparation and implementation of an FMP." 50 C.F.R. § 600.315(e)(2); *see also Massachusetts ex rel. Div. of Marine Fisheries v. Gutierrez*, 594 F. Supp. 2d 127, 132 (D. Mass. 2009) (same). Thus, it is "well-settled" that NMFS "can act when the available science is incomplete or imperfect, even where concerns have been raised about the accuracy of the methods or models employed." *N. Carolina Fisheries Ass'n*, 518 F. Supp. 2d at 85. "Absent some indication that superior or contrary data was available and that the agency ignored such information, a challenge to the agency's collection of and reliance on scientific information will fail." *Id*.

The Commonwealth challenges the accuracy of the surveys conducted by

NMFS to sample the quantity of groundfish stocks, as well as the models used to assess these stocks. The catch limits set out in FW50 are based on two stock assessments. The first assessment, conducted in December of 2011, found that GOM cod stock was overfished. AR Doc. 32 at 1,948 (describing results of the 53rd Northeast Regional Stock Assessment Workshop or SAW). A second assessment undertaken in December of 2012 essentially corroborated the results of the first and concluded that the biomass of GOM and GB cod had dropped sharply from the GARM III assessment conducted in 2008. AR Doc. 230 at 1,5491, 1,5498 (summary report of the 55th Stock Assessment Review Committee or SARC). As a result of this assessment, NMFS determined that GOM and GB cod were overfished and that overfishing was occurring. 78 Fed. Reg. at 26,122.

The Commonwealth's contention that the model used to determine the status of the cod stock violates National Standard 2 is based on NMFS' use of proxy values to calculate the target mortality rate (overfishing threshold) – the mortality rate that, applied over the long term, would result in Maximum Sustainable Yield (expressed as Fmsy). The target biomass for the stock (SSBmsy), in turn, is the long-term average size of the stock achieved by fishing at Fmsy. 50 C.F.R. § 600.310(e)(i)(C). A stock is overfished if its spawning biomass is less than half of the biomass at MSY (or SSBmsy). 55th

SAW Assessment Report at 24 (2013), available at http://nefsc.noaa.gov/publications/crd/crd1311/crd1311.pdf. (last accessed Mar. 27, 2014). The SAW working group[17] that prepared the stock assessments utilized a proxy for Fmsy (or the overfishing definition) of F40%SPR – the fishing mortality rate associated with 40% of the spawning potential ratio of the stock. *Id.* The corollary definition of overfished was thus ½SSB40%. *Id.* The Commonwealth argues that the F40% proxy calculation makes the stocks appear overfished when they are not, and thus, that the proxy value is ultimately to blame for the drastic cuts in OFLs, ABCs, and ACLs in FW50.

The Commonwealth's premise falters initially because the F40% proxy value used in calculating the MSY reference points in FW50 is identical to – and indeed, was taken from – the proxy used in the 2008 GARM III Assessment (which did not find GOM cod to be overfished). *See* AR Doc. 230 at 15,498; AR Doc. 7 at 388; 75 Fed. Reg. at 18,263. Moreover, the record contains an analysis by the Plan Development Team (PDT)[18] finding that the

---

[17] SAW is a "formal scientific peer-review process for evaluating and presenting stock assessment results to managers. The SAW protocol is used to prepare and review assessments for fish stocks in the offshore US waters of the northwest Atlantic." AR Doc. 1 at 1.

[18] PDT members are appointed by the NEFC's Executive Director and "provide an expanded pool of expertise for the purpose of conducting data analyses and providing information to the Council." Def.'s Br. at 17 n.13.

GARM III projections utilizing the proxy actually *overestimated stock size* and underestimated fishing mortality for some groundfish stocks (including GB cod). AR Doc. 40 at 2,425-2,434. Thus, the Commonwealth's position that the proxy underestimates stock size (which appears to rest largely on a single study advocating the use of "actual" or "production-model" statistics[19]) does not appear to be derived from available "superior" data. *See A.M.L Int'l v. Daley*, 107 F. Supp. 2d 90, 101 (D. Mass. 2000) ("[T]he use of a proxy for MSY is scientifically acceptable and *specifically* allowed under the guidelines." (citing 50 C.F.R. § 600.310(c)(3), (d)(3)(I)) (emphasis in original)).

Finally, the SARC[20] panel reviewing the SAW working group's calculations specifically considered the F40% proxy and scientific uncertainty when setting catch limits and determined that there were "no compelling reasons provided" to choose a different value. The panel unanimously found that the GOM and GB cod stock assessments represented the "best available science." AR Doc. 230 at 15,482, 15,498; AR Doc. 263 at 15,969. Accordingly,

---

[19] Rothschild, Brian J. and Jiao, Yue, "Comparison Between Maximum Sustained Yield Proxies and Maximum Sustained Yield," *The Open Fish Science Journal*, 2013 vol. 6, 1-9.

[20] SARC provides "an independent peer review of the outcome of the SAW Working Group deliberations and [ ] determine[s] if it is the best available science as defined under the [MSA]." AR Doc. 230 at 15,483.

NMFS' utilization of the proxy to determine the Maximum Sustainable Yield reference points did not violate National Standard 2.[21]

The Commonwealth's separate challenge to the adequacy of the assessment data itself, however, presents a closer issue. The Commonwealth argues that NMFS' trawling vessel, the *FSV Henry B. Bigelow*, and its allegedly inexpert crew, did not achieve an accurate sampling of the stocks in the Groundfish Fishery. The *Bigelow* replaced the previous research vessel, the *Albatross IV*, in 2009. AR Doc. 43 at 3,085. According to Massachusetts, after the 2011 assessment by the *Bigelow* showed sharp declines in groundfish stocks that the 2008 survey intimated were rebuilding (most notably GOM and GB Cod), NMFS should have conducted the 2012 survey with "side-by-side trawls," using the *Bigelow* and a commercial vessel supplied by the groundfish industry, in order "to determine whether design characteristics of the new trawler artificially depressed the size of [the *Bigelow*'s] catch." Mass.' Reply Br. at 2.

---

[21] The Commonwealth also cites the statements of a Council member that the NMFS model failed to account for a southward migration of GOM cod, which would suggest that the stock had not declined but only relocated. AR Doc. 27 at 1,909. The NEFMC responded to the member's concerns and found based on "preliminary explorations of biomass trends" that the cod were absent from the historically abundant locations because of an overall decline in population, and not because of migration to more southerly waters. AR Doc. 35 at 2,210, 2,222-2,223.

In support of this contention, Massachusetts cites an April 30, 2012 joint letter (sent some seven and a half months before the December 2012 survey) to the Secretary from the Massachusetts Congressional delegation stating, in relevant part,

> we have been told by many within the industry that the use of a four seam bottom trawl equipped with a rockhopper sweep is not the most efficient means of catching groundfish for a truly accurate sampling. In fact, the initial use of the NMFS' survey vessel the *Bigelow* coincides directly with a significant decrease in the U.S. share of Georges Bank yellowtail from 77% in 2009 when the *Bigelow* data was first used to 48% in 2012. While there may be a biological reason or some other cause for this decrease, it is imperative that fishermen fully embrace and trust the collection methods that determine how a fish stock is managed and allocated, and we urge you to implement side-by-side trawl survey tows using a commercial vessel to compare data and provide a more reliable assessment of this species.

AR Doc. 52 at 4,590. Massachusetts also cites a January 6, 2013 email to NOAA Northeast Regional Administrator John Bullard from Dr. Brian Rothschild,[22] a professor at the School for Marine Science and Technology at U-Mass Dartmouth, positing the "virtually unanimous opinion that there is something wrong with the stock assessment," and suggesting that NMFS "obtain additional data from a survey using industry boats and gear," which the "industry is willing to contribute." AR Doc. 237 at 1,5547-1,5548. Finally, a

---

[22] *See* n.19 and n.27.

NEFMC member questioned the results of the 2011 assessment, arguing that, for unknown reasons, it had undersampled older GOM cod and that such undersampling led to suspect instances where "area-swept estimates of stock biomass approach model estimates of biomass for the entire stock."[23] AR Doc. 27 at 1,911. The NEFMC considered the member's demurral, but found it unsupported by the available data, which showed instead that a non-modeled calculation of stock biomass showed a "close agreement" with model-based estimates. *Id.* at 2219.

The issue boils down to this: whether NMFS' refusal to deploy an additional, fishing industry-supplied survey vessel as a check on the accuracy of the *Bigelow* amounted to a failure to resort to the "best scientific information available" in formulating the groundfish stock assessments.[24]

---

[23] One scholarly article notes that "[i]n the case of demersal species, trawls have generally been used as samplers under the assumption that they tend to represent the abundance of individuals in an area that is 'swept' as they are dragged on the seafloor. This rather simple concept has been the basis of the 'swept-area' method employed in direct biomass assessment programs for bottom dwelling organisms worldwide (i.e. groundfish, shrimps, crabs, clams, and others.)" Paul R. Pezuto, Jose A. Alvarez-Perez & Roberto Walrich, THE USE OF THE SWEPT AREA METHOD FOR ASSESSING THE SEABOB SHRIMP *XIPHOPENAEUS KROYERI* (HELLER 1962) BIOMASS AND REMOVAL RATES BASED ON ARTISANAL FISHERY-DERIVED DATA IN SOUTHERN BRAZIL: USING DEPLETION MODELS TO REDUCE UNCERTAINTY, Lat. Am. J. Aquat. Res., 36(2): 246 (2008).

[24] Massachusetts also relies on a letter from the Conservation Law Foundation (CLF) to NOAA advocating the replacement of model-based stock

Despite NMFS' rejection of side-by-side trawling, prior to undertaking the 2012 assessment, NOAA conducted extensive calibration experiments to detect any survey disparities between the results achieved by the *Bigelow* and *Albatross IV*. *See* AR Doc. 43 at 2,744. NOAA also relied on a "large-scale comparative study" that "demonstrated that catch rates for the *Bigelow* were generally higher than catch rates for the [ ] *Albatross IV*." *Id*. at 2565. While acknowledging that "[o]wing to its deeper draft, the [ ] *Bigelow* cannot sample the same inshore strata as the *Albatross*," NOAA concluded that "[t]his difference was unimportant for all groundfish stocks except [SNE/MA] windowpane flounder." *Id*.

While the side-by-side trawling option was a proven methodology that NMFS could have deployed, National Standard 2 "does not mandate any affirmative obligation on [NMFS'] part" to collect new data. *Commonwealth of Mass. by Div. of Marine Fisheries v. Daley*, 10 F. Supp. 2d 74, 77 (D. Mass. 1998). Simply stated, NMFS is not required to strive to obtain the best scientific data *possible*. *Blue Water Fishermen's Assn*, 226 F. Supp. 2d at 338.

---

assessments with "new low-frequency sonar technology." AR Doc. 52 at 4,591. Although NOAA replied to CLF that it had begun work with researchers to assess and develop this new technology for future use, AR Doc. 65 at 5,263, National Standard 2 has never been held to require NMFS to deploy a stock assessment technology that is unproven in practice.

Because the imperative imposed on the agency by Congress is one of urgent action, and not the achievement of fishery science perfection, the agency may – indeed must – act in times of perceived emergency on "incomplete or imperfect" data.[25]  *See N. Carolina Fisheries Ass'n*, 518 F. Supp. 2d at 85. Here, there is no record evidence that more accurate stock assessments were obtained and ignored, nor any compelling evidence that the dismaying assessment results were the product of flawed data collection rather than an accurate science-based portrait of groundfish stocks in a state of imminent collapse.[26]  *Compare Guindon v. Pritzker*, 2014 WL 1274076, at *20 (D.D.C. Mar. 26, 2014) (NMFS violated National Standard 2 in a "rare instance" in which it disregarded "accurate and reliable" landings estimates "in favor of a projection that the agency knew (with near certainty) was inaccurate.").  In

---

[25] NMFS represents that it has, in fact, recently completed the first phase of an "Industry-Based Yellowtail Flounder Survey" to "see how an industry-based survey could be used to augment other data being used in stock assessments." Def.'s Br. at 21 n.17.

[26]  The Commonwealth itself, in the not too distant past, has been of the same view. In its formal comments during the promulgation of Framework 50, the Commonwealth cited the *Bigelow* data in raising its own alarum over the bleak state of the fishery.  *See* AR Doc. 599 at 33,587 ("[Massachusetts' Division of Marine Fisheries] is well aware that GOM cod abundance is too low. *This conclusion is supported by our own research (spring bottom trawl survey)* and DMF research in our cod conservation zone [ ] – a source of great concern.") (emphasis added)).

sum, the Commonwealth has failed to clear the "high hurdle" of proving that NMFS ignored "superior or contrary" scientific information in performing its stock assessments as is required to make out a violation of National Standard 2. *Ctr. for Biological Diversity v. Blank*, 933 F. Supp. 2d 125, 150 (D.D.C. 2013).[27]

**National Standard 8**

Massachusetts' final challenge to the FY 2013-2015 catch limits arises under National Standard 8 of the MSA, which provides that

> [c]onservation and management measures shall, consistent with the conservation requirements of this chapter (including the prevention of overfishing and rebuilding of overfished stocks), take

---

[27]Amicus Center for Sustainable Fisheries (CSF) attempts to provide support for Massachusetts' position that the cod surveys and assessments were inaccurate with a letter from the Massachusetts Marine Fisheries Institute authored by its co-chair Dr. Rothschild (who is also CSF's President and CEO), criticizing the methodology of the of the predecessor 2011 assessment. *See* AR Doc. 48 at 4,287-4,290. Dr. Rothschild's letter, however, does not offer his own "superior data" of the cod population, and NMFS is permitted to "choose between conflicting facts and opinions, so long as it justifies the choice." *Ctr. for Biological Diversity,* 933 F. Supp. 2d at 149. The independent SAW and SARC panels specifically considered many of the criticisms raised by Dr. Roghschild and CSF – *e.g.,* calculation of proxy values and calibration coefficients, inclusion of inshore strata data, utilization of a constant natural mortality rate, adequacy of survey data – and concluded that the successor 2012 assessment was based on the best science available. While CSF "may disagree with that assessment, its argument essentially amounts to nothing more than competing views about policy and science, on which the Court defers to the agency." *Id.* at 147 (internal quotations, citation, and alterations omitted).

into account the importance of fishery resources to fishing communities by utilizing economic and social data that meet the requirements of paragraph (2), in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities.

16 U.S.C. § 1851(a)(8). Massachusetts claims that NMFS is responsible for a *"per se"* violation of National Standard 8 because of its failure to consider any less-restrictive viable alternatives to its proposed and ultimately implemented Annual Catch Limits.[28] This contention is premised on the NEFMC's Environmental Assessment (EA) of Framework 50, in which the Council compared the socioeconomic impact of its "preferred alternative" (the ACLs that were adopted in FW 50) with a "no-action alternative."[29] *See* AR Doc. 495 at 27,257 (Final Environmental Assessment of FW 50). Because the no-action alternative proposed setting no specifications (OFLs, ABCs, ACLs) for nine of the twenty Groundfish Fishery stocks,[30] Massachusetts argues that the

---

[28] Massachusetts cites projections of the NEFMC that the reduction in catch by Massachusetts fishing vessels will lead to an equivalent 32% - 38% loss in income earned over FY 2011. While all parties recognize that the ACL reductions entail painful economic consequences, the Council may not have fully accounted for the fact that a diminution in supply of desired stocks like cod and haddock will have an upward mitigating effect on market price.

[29] Consideration of the no-action alternative is required by the National Environmental Policy Act. 40 C.F.R. § 1502.14(d).

[30] The no-action alternative would have left in place Framework 47, which did not include specifications for the nine fishery stocks (including GOM

alternative did not comply with the MSA's requirement that councils "develop annual catch limits for each of its managed fisheries." 16 U.S.C. § 1852(h)(6).

National Standard 8 requires NMFS, "subject to a rule of reason," to "examine[] the impacts of, and alternatives to" the plan it ultimately adopts. *Little Bay Lobster Co., Inc. v. Evans*, 352 F.3d 462, 470 (1st Cir. 2003). Massachusetts' position that NMFS did not fulfill its obligations under National Standard 8 is based on Congressional mandates set out in the National Environmental Policy Act (NEPA) and Regulatory Flexibility Act (RFA).[31] At least one court has found that NMFS failed to comply with NEPA when it relied on an Environmental Assessment that compared the effects of proposed ACLs only to a no-action alternative that itself would have violated the MSA. *See Flaherty*, 850 F. Supp. 2d at 71 (D.D.C. 2012); *see also Am. Oceans Campaign v. Daley*, 183 F. Supp. 2d 1, 19-20 (D.D.C. 2000) (NMFS violated NEPA where its EAs did not consider alternatives to its preferred amendment beyond the status quo, which violated the MSA). According to Massachusetts, "NMFS's obligation under National Standard 8 tracks its obligations under NEPA and the RFA." Mass.' Br. at 15.

---

and GB cod) for the years 2013-2014.  77 Fed. Reg. 26,104, 26,106 (May 2, 2012); AR Doc. 495 at 27,263.

[31] Massachusetts is not asserting claims under NEPA or RFA.

Massachusetts, however, does not cite a single case supporting its contention that the MSA implicitly incorporates the procedural requirements of the NEPA or the RFA. Instead, the Commonwealth asserts that the First Circuit has "made clear" in *Little Bay Lobster* that a court's "method of analysis" is the same when considering claims under the three statutes. Mass.' Rep. Br. at 4 n.3. But while NMFS may cite to an Environmental Assessment – which may also be used to satisfy NEPA and RFA requirements – to demonstrate compliance with National Standard 8, it does not follow that the obligations imposed by National Standard 8 are identical to those mandated by the NEPA and the RFA. *See Little Bay Lobster*, 352 F.3d at 470 (the RFA "creates procedural obligations" and is thus a "quite different statute" than National Standard 8); *see also Ace Lobster Co., Inc. v. Evans*, 165 F. Supp. 2d 148, 183 (D.R.I. 2001) ("[N]either the standards set in national standard 8 and the RFA, nor the requisite legal analysis for each, are the same."). For this reason, the First Circuit's reference to a single environmental impact statement to dispose of claims under both National Standard 8 and the RFA does not carry the argument that the statutes' requirements are co-extensive. *See Little Bay Lobster*, 352 F.3d at 469-470.[32]

---

[32] Massachusetts' corollary argument that the First Circuit in *Little Bay* "drew upon cases construing the RFA and NEPA when it interpreted National

Quite to the contrary, the advisory guidelines to National Standard 8 explicitly state that "*[d]eliberations* regarding the importance of fishery resources to affected fishing communities [ ] must not compromise the achievement of conservation requirements and goals of the FMP." 50 C.F.R. § 600.345(b)(1) (emphasis added). The plain language of National Standard 8 makes clear that NMFS' obligation to minimize the economic impact of a Fishery Management Plan is subordinate to the MSA's conservation goals. *Lovgren*, 701 F.3d at 35. Thus, "[i]t is only when two different plans achieve *similar conservation measures* that [NMFS] takes into consideration adverse economic consequences." *Natural Res. Def. Council, Inc. v. Daley*, 209 F.3d 747, 753 (D.C. Cir. 2000) (emphasis added); *see also Blue Ocean Inst. v. Gutierrez*, 585 F. Supp. 2d 36, 44 n. 4 (D.D.C. 2008) ("Because none of the scenarios that the Department [of Commerce] evaluated 'achieved similar conservation measures,' it should not have considered the adverse economic effects on the proposed closure on fishing communities."). Even when deciding between two alternatives that would achieve similar conservation goals, NMFS

Standard 8," Mass.' Rep. Br. at 4 n.3, is similarly unavailing. The First Circuit merely used these cases to support its observation that National Standard 8 is "subject to a rule of reason." *Little Bay Lobster*, 352 F.3d at 470. The Court did not undertake to graft onto National Standard 8 all of the procedural requirements of NEPA and the RFA, nor absent a mandate from Congress, would it have had the power to do so.

"need not conduct an official or numerical cost/benefit analysis." *N. Carolina Fisheries Ass'n*, 518 F. Supp. 2d at 92.

Here, Massachusetts contends that NMFS erred by not considering a substitute menu of higher ACLs to determine whether expanded catch limits could have accomplished the MSA's conservation objectives at a lower cost to the affected fishing communities. The adopted ACLs, however, were derived from the Acceptable Biological Catch recommendations of the Scientific and Statistical Committee. *See* Doc. 498 at 27,649 (App. III to FW 50 EA). In developing ACLs, the NEFMC "may not exceed the fishing level recommendations of its scientific and statistical committee." 16 U.S.C. § 1852(h)(6). Thus, any proposed slate of ACLs above the SSC's recommendations would itself have violated the MSA.[33]

The only viable alternative that Massachusetts can identify, then, is shrinking or eliminating the management uncertainty buffers between each stock's ABC and ACL to increase the catch limits. *See* 50 C.F.R. § 600.310(f)(5) (ACL cannot exceed the ABC, but the values may be identical). Consistent with

---

[33] Even under a NEPA analysis, NMFS' "choice of alternatives [is] evaluated in light of its reasonably identified and defined objectives" and an alternative that NMFS reasonably concludes "does not bring about the ends of the federal action" is properly excluded from consideration. *Flaherty*, 850 F. Supp. 2d at 71 (internal quotations, citation and alterations omitted).

National Standard 2, however, NMFS must rely on the "best scientific information available"; it cannot simply reduce or eliminate accounting for management uncertainty in favor of socioeconomic considerations without some justification for doing so. 16 U.S.C. § 1851(a)(2); *see also* 74 Fed. Reg. 3,178, 3,190 (Jan. 16, 2009) ("NMFS believes that fisheries managers cannot consistently meet the requirements of the MSA to prevent overfishing and achieve, on a continuing basis, [optimum yield] unless they address scientific and management uncertainty.").

The Annual Catch Limits set out in Framework 50 maintained the default buffer range established in Framework 44 of between 3% to 7% of the Acceptable Biological Catch, with 5% used for most stocks (in other words, ACLs were set between 93% and 97% of the ABCs). 78 Fed. Reg. at 26,195-26,196; AR Doc. 498 at 27,559. The Council explicitly considered these management uncertainty buffers and concluded that they were necessary to prevent overfishing, but did, nonetheless, decrease the buffer for two stocks within this range, while rejecting proposals to increase the existing buffers for others. *See* AR Doc. 498 at 27,659-27,661. Contrary to Massachusetts' position, nothing in the record suggests that the Council acted unreasonably

in the way it addressed the issue.[34]

Finally, the record demonstrates that the Council and NMFS took appropriate steps to mitigate the admittedly "large negative" social and economic impacts flowing from the "drastic" ACL reductions. In addition to the remedial measures discussed above with respect to National Standard 1, the Council and NMFS elected to use the higher of the two ABCs for GOM cod recommended by the SSC, despite the SSC's preferred smaller value. *See* AR Doc. 496 at 27,612 ("The SSC agreed with the PDT that the preferred ABC for 2013-2015 should not exceed 1,249mt, but also includes the second alternative of ABC not to exceed 1,550mt . . . .").[35] As NMFS explained in the rule implementing FW 50, it selected the larger value because "ignor[ing] an alternative that meets the conservation objectives of the FMP and the [MSA] and that could help mitigate some of the economic impacts of this action would

---

[34] Massachusetts' contention that the Council and NMFS considered the economic impact of its preferred alternative only in comparison to the no-action alternative oversimplifies matters. The preferred alternative contained three different scenarios and an accompanying economic analysis of each. *See* AR Doc. 495 at 27,472-27,489. The EA also compared the projected economic impact of the preferred alternative to data from FY 2011 as a baseline. *Id.*

[35] The SSC suggested two ABCs for GOM cod (despite expressing its preference for the smaller value) because the SARC panel approved two assessment models for the stock utilizing different natural mortality assumptions. *See* 78 Fed. Reg. at 26,177.

not be consistent with National Standard 8." 78 Fed. Reg. at 26,195. NMFS additionally authorized the carryover of up to 10% of the uncaught fish from the higher catch limits of 2012 for every eligible groundfish stock with the exception of GOM cod, which was set at 1.85%.[36] 78 Fed. Reg. at 26,188; *see generally* AR Doc. 500 at 27,779 (App. V to FW 50 EA discussing carryover).[37] This "one-year transition period" continuing the carryover rule instituted in Amendment 16 had the practical effect of adding these carryover amounts to FW 50's ACLs, thus further alleviating the dire economic impact of the new catch limits. In sum, NFMS complied fully with the mandate of National Standard 8 in considering and implementing measures to reduce the social and economic consequences of the ACLs on fishing communities, while acting consistently with the primary conservation objectives of the MSA.

ORDER

For the foregoing reasons, plaintiffs' motions for summary judgment are DENIED. Defendants' motion for summary judgment is ALLOWED. The

---

[36] NMFS sufficiently explained its methodology behind calculating the 1.85% carryover for GOM cod to prevent overfishing. *See* 78 Fed. Reg. at 26,199; AR Doc. 500 at 27,785.

[37] NMFS' decisions to permit carryover from FY 2012 and use the higher value ABC for GOM cod are currently being challenged for exceeding the SSC's recommendations and creating a likelihood of overfishing. *See Conservation Law Found. v. Pritzker*, 13-cv-8210 (D.D.C.).

Clerk will enter judgment for defendants and close the case.

SO ORDERED.

/s/ Richard G. Stearns
_____
UNITED STATES DISTRICT JUDGE